# AFFIDAVIT

I, John Hegarty, being duly sworn, declare and state the following is true and correct to the best of my knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), a component of the U.S. Department of Justice and have been so employed since May 17, 2015. I am currently assigned to ATF Kansas City Group VII and am charged with investigating violations of federal firearm laws. I have successfully completed the Criminal Investigator Training Program and the ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to this employment, I was a Police Officer with Leawood, Kansas Police Department and attended the 16-week Johnson County Regional Police Academy in Overland Park, Kansas. Prior to employment with the Leawood Police Department, I attended Metropolitan State College of Denver, where I earned a bachelor's degree in History with a minor in Criminal Justice. During the course of my employment, I have received training in investigations and have participated in numerous firearm and narcotic related investigations, which led to the prosecution of suspects. I have also participated in the execution of numerous search warrants that resulted in felony arrests and the confiscation of firearms and narcotics.

2. During the course of my employment, I have received specialized training in narcotics and firearms related investigations and instruction pertaining to the laws of search and seizure and have been involved in numerous investigations related to the possession of firearms by prohibited persons, firearm trafficking related offenses, and distribution of narcotics throughout my law enforcement career. I am also familiar with the enforcement of Federal firearms and narcotics laws. My training and experience have involved, among other things, (a) the debriefing of defendants, witnesses, informants, and others who have knowledge of the distribution and transportation of controlled substances and/or the illegal acquisition and distribution of firearms, and the laundering and concealment of proceeds of firearms trafficking/drug trafficking; and (b) surveillance, and the analysis of documentary and physical evidence pertaining to afore mentioned criminal actions. Based on my training and experience as an investigator, I have become familiar with the manner in which firearms traffickers and narcotics traffickers conduct their firearms and narcotics related business, including the methods employed by narcotics dealers to import and distribute narcotics, the manner in which firearms are exported and/or transported illegally, the methods in which individuals collect and launder firearm and narcotic proceeds, and other aspects of firearms and narcotics trafficking. I have been personally involved in numerous investigations involving the unlawful possession and trafficking of firearms and the possession, manufacture, and distribution of controlled substances, including cocaine and cocaine base, methamphetamine, marijuana and heroin.

3. This affidavit contains information necessary to support probable cause for this application. It is not intended to include every fact or matter observed by me or known by law enforcement. The information provided is based on my personal knowledge and observations during the course of this investigation, information conveyed to me by other law enforcement

officials, and my review of records, documents, and other physical evidence obtained during the investigation.

## PROBABLE CAUSE

4.     In March of 2023, SA John Hegarty with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) met with Confidential Informant 31768 (CI), who has proven to be reliable in the past, to discuss the firearm and narcotics trafficking operation being facilitated by Alejandro ZAVALA, Cody BONHOMME and Kaleb ACUNA.  CI identified the following:

   a. Alejandro ZAVALA distributes large amounts of cocaine, firearms and machinegun conversion devices (MCDs) in the Kansas City, Missouri (KCMO) area.  ZAVALA has several individuals who assist him in this ongoing operation, including Cody BONHOMME and Kaleb ACUNA.
   b. CI advised ZAVALA maintains several "stash" houses in the KCMO area which are residences where ZAVALA keeps his firearms and narcotics.  CI said there are certain people who live at these residences and sell narcotics and firearms for ZAVALA. CI identified 718 Newton Avenue, KCMO as the primary stash house and said BONHOMME lives there, guards the residence, and sells firearms and narcotics out of the residence.  CI also identified 2434 Poplar Avenue, KCMO as a residence which is owned by ZAVALA, but ACUNA lives there and sells firearms and narcotics for ZAVALA.  Tax records and open-source information showed 2434 Poplar Avenue was in fact associated to ZAVALA.
   c. CI said ZAVALA and BONHOMME have been involved in several shooting incidents but could only describe one in any kind of detail.  Specifically, CI identified victim Makiah Caruthers who was shot by ZAVALA in February of 2022.  CI said they were at the "races" in North Kansas City when ZAVALA shot Caruthers over a drug debt dispute.  SA Hegarty did a search for police reports regarding this incident and discovered that Caruthers was indeed shot in North Kansas City during some "street races."  The Kansas City Missouri Police Department (KCMO PD) report does not list a known suspect.  Additionally, a KCMO police report search of police contacts with BONHOMME revealed a car check in April 2022 when KCMO PD stopped BONHOMME driving a silver Chrysler 300.  On 3/30/2022, there was a homicide in KCMO where this Chrysler 300 was reported to have left the scene and sustained gunfire damage. On 4/5/2022, KCMO PD conducted a traffic stop on the vehicle after it left 718 Newton Avenue in order to identify the occupant(s).  BONHOMME was the sole occupant (driver) and had a loaded firearm on his seat.  However, because BONHOMME was not a felon, he was released from the scene and never listed as a suspect in the homicide.

5.     A search of phone records and subscriber information revealed ZAVALA maintains the phone number 417-210-5372 through T-Mobile, and BONHOMME maintains the

phone number 816-749-8879 through T-Mobile. The CI corroborated both phone numbers. Records showed a significant number of phone communication between ZAVALA and BONHOMME.

6. On 3/31/2023, ATF Agents met with CI who advised Kaleb ACUNA was willing to meet an ATF Undercover Agent (UC) and sell the UC a firearm and marijuana. CI and UC contacted ACUNA at phone number 816-786-2990 who advised ACUNA had an AR15 pistol and ¼ pound of marijuana ACUNA was willing to sell for $1325.00. ACUNA also indicated that he could make the AR15 pistol full auto. ATF SA Hegarty searched CI prior to the deal and did not locate any contraband. Shortly after, CI and UC drove to 2434 Poplar Avenue, KCMO where they met with ACUNA inside the residence. ACUNA proceeded to sell the UC ¼ pound of marijuana and an Anderson, AM-15, multi-cal, semi-automatic pistol, bearing serial number 22104043. In exchange the UC provided ACUNA with $1320.00 US Currency "buy money." Shortly after, UC and CI departed the residence. SA Hegarty spoke with the CI who advised ACUNA did not want to sell the UC the "Switch" which would have converted the AR15 pistol into full auto because ACUNA did not know the UC and did not trust the UC.

7. On 4/4/2023, ATF Agents met with CI who advised ZAVALA was not happy that CI introduced the ATF UC to ACUNA several days ago. CI advised ZAVALA is very careful and protected and does not like selling to new customers. CI advised ZAVALA relies on his already established network to distribute ZAVALA's firearms and narcotics. CI said ZAVALA did not want CI to buy anything else from ACUNA but instead wanted CI to deal directly with ZAVALA because CI was not a regular customer of ACUNA. ZAVALA advised he was willing to sell CI additional firearms and narcotics but only if CI came alone.

8. On 4/4/2023, CI advised ZAVALA would sell CI one ounce of cocaine, a Glock-type pistol with a Glock Switch (which converts it into a machine gun), and an AR15 "Switch" which also converts an AR15 into a machinegun, for $2500.00 US Currency. CI said ZAVALA instructed CI to go purchases these items from BONHOMME at 718 Newton Avenue, KCMO. ATF SA Hegarty provided CI with $2500.00 UC Currency "buy money", equipped CI with audio/video recording, and CI drove to 718 Newton Avenue, KCMO where CI went inside and met with Cody BONHOMME. CI provided BONHOMME with the $2500.00 US Currency and BONHOMME gave the CI a Poly80 pistol, a "Swift Link" (machine gun conversion device, hereafter referred to as a "MCD"), and approximately 1 ounce of cocaine. BONHOMME attempted to sell the pistol to the CI without a "clip" (ammunition magazine) and CI requested that BONHOMME included a "clip." BONHOMME called ZAVALA and asked if there was a pistol magazine at the residence that BONHOMME could include with the pistol he was providing to the CI, to which ZAVALA confirmed there was. BONHOMME then provided this pistol magazine to CI and CI departed the residence. Shortly after, CI departed the residence ATF Agents on surveillance observed BONHOMME come out of the residence and get into a maroon Pontiac sedan, bearing Missouri license plate XF1K9G. The registration on this vehicle showed it was owned by BONHOMME. Surveillance followed BONHOMME driving the Pontiac to A&M Auto Sales, 7001 E Truman Road, KCMO where BONHOMME was seen getting out of the vehicle and walking towards the business (A&M Auto Sales is a used car dealership run by ZAVALA).

3

9. SA Hegarty met and debriefed with the CI. The CI advised BONHOMME was on the only person inside the residence and had been there to sell the evidence to the CI at the direction of ZAVALA. CI also advised CI advised BONHOMME was usually the only person at that residence selling firearms and narcotics for ZAVALA. CI referred to that residence as one of ZAVALA's "stash houses." The 29.4 grams of cocaine were later tested and showed a positive hit for the presumptive presence of cocaine. Also, the pistol was identified as a Polymer80, model PF940SC, 9mm caliber, full auto pistol, no serial number field and confirmed to function as a full auto machinegun.

10. On 4/7/2023, ATF Agents met with CI for the purpose of conducting another controlled purchase from BONHOMME that was set up by ZAVALA. This time, CI advised ZAVALA was willing to sell the CI a Polymer80 pistol, 3 MCDs, and ½ ounce of cocaine for $2500. ZAVALA again instructed CI to go to 718 Newton Avenue, KCMO and purchase the items from BONHOMME. SA Hegarty provided CI with $2500.00 "buy money", searched CI for contraband, equipped CI with audio/video recording, and then CI drove to 718 Newton Avenue, KCMO where CI met with BONHOMME inside the residence. The CI provided BONHOMME with the "buy money" which BONHOMME began counting and got the items CI was purchasing. At one point, BONHOMME called ZAVALA and asked ZAVALA to clarify what BONHOMME was supposed to provide the CI. ZAVALA (over the phone) instructed BONHOMME to provide the CI with "2 Glock Switches, an AR Switch, a polymer, and a half ounce." After the phone call was completed, BONHOMME expressed his anger with the CI because BONHOMME was tired of ZAVALA sometimes not communicating with BONHOMME about the deals that ZAVALA sets up without telling BONHOMME, who self-identified as the "delivery man." From the captured surveillance video BONHOMME can be seen kneeling down in front of a safe full of firearms. The CI points out which one the CI wants to purchase. BONHOMME comes out of the safe room a short time later and provides the CI with the Poly80 pistol, 2 Glock Switches MCDs, one AR15 Swift Link MCD, and approximately 14.7 grams of cocaine. Even while this was happening, BONHOMME still continued to get more agitated in talking about ZAVALA and said "I do everything I'm fucking told. Any and everything. We could be right here right now and this nigga [referencing ZAVALA] could be like go shoot the house up across the street and I'm going to go fucking do that." Shortly after this conversation, CI left the residence with the purchased evidence which CI immediately provided to SA Hegarty. The 14.7 grams cocaine were later tested and confirmed to test positive for the presumptive presence of cocaine. Also, the firearm was identified as a Polymer80, model PF940SC, 9mm caliber, semi-automatic, pistol bearing no serial number.

11. On 4/18/2023, ATF Agents met with CI for the purpose of conducting another controlled purchase from BONHOMME that was set up by ZAVALA. This time, CI advised ZAVALA was going to sell the CI ½ ounce of cocaine and 2 AR15 machine guns from at the residence of 718 Newton Avenue, KCMO. Prior to the deal, CI was searched for contraband with nothing found. CI was also provided with $2500.00 "buy money" and equipped with audio recording equipment which captured audio during the controlled purchase. Upon arriving at 718 Newton Avenue, the CI was able to enter the residence where CI met with BONHOMME, ZAVALA and ACUNA inside the residence. CI provided ZAVALA with the $2500.00 buy money, and in exchange ZAVALA gave the CI two AR15 pistols with MCDs installed (which converted the AR15 pistols into full-auto pistols) and 14.7 grams of cocaine. At the conclusion of

the transaction, the CI met with ATF Agents and provided the two AR-15 Type pistols with MCDs installed and 14 grams of cocaine. Fourteen rounds of 5.56x39 caliber ammunition were located within the magazine of one of the AR15 pistols. The CI's person and vehicle were searched for contraband by ATF Agents with nothing being located. The CI was also interviewed by SA Hegarty and advised that BONHOMME and ZAVALA both handled the firearms and cocaine that were sold to CI while ACUNA stood there and watched. CI advised before ZAVALA gave CI the AR15 pistols, ZAVALA installed a "Switch" (Swift Link MCD) inside each AR15 pistol to convert them to machineguns. Also, CI said BONHOMME weighed out the cocaine and handed it to ZAVALA who in turn provided it to CI. CI said ZAVALA did not sell any Glocks with Switches because ZAVALA is waiting for additional Glock Switches to come in. The 14.7 grams of cocaine were later tested and showed a positive hit for the presumptive presence of cocaine. Also, both AR15 pistols were field tested and confirmed to function as full auto machineguns. These firearms were identified as an Anderson, model AM-15, multi caliber, full-auto pistol, bearing seral number 22104026, and an Anderson, model AM-15, multi caliber, full-auto pistol, bearing serial number 22104040.

12. On 04/25/2023, ATF Agents met up with CI again for the purpose of conducting a controlled purchase of narcotics from ZAVALA. This time, the CI confirmed ZAVALA was ready to meet an ATF UC and sell the UC two Glock machineguns and ½ ounce of cocaine. ZAVALA called the CI and instructed the CI and UC to meet ZAVALA at Midway Auto Parts, located at 4210 Gardner Avenue, KCMO. ZAVALA advised he was at his car dealership, A&M Auto located at 7001 E Truman Road, KCMO, and would meet the CI and UC at Midway Auto Parts. Prior to the deal, CI was searched for contraband with nothing found. ATF Surveillance units (hereafter referred to as "surveillance") on A&M Auto observed ZAVALA come out of the dealership and walk up to a black, Pontiac G8. ZAVALA put what appeared to be a paper license plate on the rear of the vehicle and then got in and proceeded to drive away from the dealership. Surveillance followed ZAVALA as it drove to 415 Bellaire Avenue, KCMO, in front of which ZAVALA parked his vehicle. ZAVALA walked towards 415 Bellaire Avenue and went inside the residence. A short time later, surveillance observed ZAVALA come out of 415 Bellaire Avenue carrying a brown cardboard box. ZAVALA put the box in the Pontiac G8, got into the driver's seat, and drove away.

13. Surveillance continued to follow ZAVALA as he drove to Midway Auto Parts and parked next to the CI and UC, where surveillance observed ZAVALA get out of his vehicle and retrieve the brown cardboard box and place it in the UC vehicle. The UC stated that UC wanted to put the firearms in the trunk. The UC then removed the cardboard box and brought it to the rear of the UC vehicle. The UC observed three handguns and a clear plastic baggie containing approximately ½ ounce of suspected cocaine in the cardboard box. In return, the UC provided ZAVALA with $2,000.00 US Currency "buy money." ZAVALA observed the UC transfer the firearms and the narcotics into a suitcase located inside the trunk. ZAVALA stated, "I'm not gonna lie to ya. This is federal, nigga. This ain't no little kid shit." ZAVALA was referencing the violations of federal law by selling machine guns and narcotics. ZAVALA then stated, "I can get more shit. All day, every day." The UC stated the UC wanted to purchase additional firearms. ZAVLA replied, "what you want? AR's? How you want it? Fully?" Through SA Hegarty's training and experience, SA Hegarty knows ZAVALA was offering full-automatic AR-style rifles for sale. The CI and ZAVALA then entered ZAVALA's vehicle. Shortly thereafter, ZAVALA

5

exited and approached the UC.  ZAVALA stated that he had inadvertently placed his personal handgun inside the cardboard box prior to placing it in the UC vehicle.  The UC and ZAVALA opened the trunk of the UC vehicle and confirmed that he had indeed placed his firearm inside the box.  The UC provided the firearm back to ZAVALA.  The UC offered to purchase the firearm, to which ZAVALA stated it was not currently for sale.  ZAVALA then instructed the UC to talk to the CI about additional firearms purchases.  The CI informed the UC that ZAVALA had agreed to sell the UC three (3) Glock Switches for $1000.00.  The UC agreed to the purchase and provided the CI with $1000.00 in order to provide it to ZAVALA.  ZAVALA and the CI then went inside the auto parts store.  The CI exited and approached the UC.  The CI stated that ZAVALA had agreed to sell his personal firearm to the UC.  ZAVALA instructed the CI to remove the firearm from ZAVALA's vehicle floorboard and provide it to the UC.  The CI went to ZAVALA's vehicle and removed the firearm.  The CI then provided the firearm to the UC.  ZAVALA then instructed the UC and CI to meet ZAVALA at the Up In Smoke parking lot located at 5908 Wilson Avenue, KCMO while ZAVALA went to get the Glock Switches.

14.     Surveillance followed ZAVALA as he left Midway Auto Parts and drove back to 415 Bellaire Avenue, KCMO.  ZAVALA parked in front again and went inside the residence.  Shortly after, ZAVALA came out of the residence and proceeded to drive to 5908 Wilson Avenue, KCMO (Up In Smoke business parking lot).  Surveillance observed ZAVALA park next to the CI and UC vehicles.  The CI exited CI's vehicle and approached ZAVALA, who was still in his vehicle.  The UC observed the CI provide the UC's US Currency to ZAVALA and saw ZAVALA provide the CI with a silver plastic baggie.  The CI then walked immediately to the UC's vehicle and entered the passenger seat.  The CI provided the silver baggie to the UC.  The UC observed it contained three Glock Switches.  The UC and CI then departed the area and returned to the staging location for debriefing.  Surveillance was maintained on ZAVALA and observed ZAVALA drive to 7001 E Truman Road, KCMO (A&M Auto Sales), park his Pontiac G8, and go inside.  Surveillance was maintained for approximately 30 minutes before being concluded.

15.     At the debrief, the CI confirmed that ZAVALA provided the CI $100 for brokering the 2nd deal for three Glock Switches.  The CI provided the $400 of "brokering fees" back to SA Hegarty.  The CI and the CI's vehicle were searched for contraband with negative results.

16.     The firearms purchased by the UC were identified as Polymer80, model PF940SC, 9mm caliber, semi-automatic, pistol bearing no serial number, a Taurus, Model PT111G2A, 9mm caliber, semi-automatic pistol bearing serial number ADJ660311, and a Glock, Model 22, .40 caliber, full-auto pistol (outfitted with Glock Switch), bearing serial number MSE914.  Also, the three Glock Switches were confirmed to be MCDs which convert Glock-type pistols into full-auto pistols.  The Glock purchased by the UC also field tested as a full-auto firearm.  The 14.7 grams of cocaine were later tested and showed a positive hit for the presumptive presence of cocaine.

17.     On 4/29/2023, ATF Agents began monitoring the phone activity of ZAVALA and BONHOMME pursuant to a Court Order issued by the Western District of Missouri on 4/28/2023.  ATF had previously identified ZAVALA's phone numbers as 417-210-5372 and 816-209-3359 and BONHOMME's phone number as 816-749-8879.  Current records showed ZAVALA, BONHOMME and ACUNA all contact each other frequently.

18. On 5/6/2023, fixed surveillance was conducted on 2434 Poplar Avenue and 415 Bellaire. At approximately 12:11 pm, Kaleb ACUNA, exited 2434 Poplar Avenue wearing a white shirt, white pants, and was carrying a backpack. ACUNA entered the driver's seat of a two-door, black Chevy Camaro (which he is known to drive) and departed north bound on Poplar. At approximately 12:20 pm, the same black Chevy Camaro arrived at 415 Bellaire Avenue. ACUNA, wearing the same all white clothing, exited the driver seat of the Camaro and walked into 415 Bellaire carrying a backpack. At approximately 12:29 pm, ACUNA, ZAVALA, ZAVALA's young son, and an unknown male wearing a red shirt/white pants exited 415 Bellaire Avenue and entered ZAVALA's black Dodge Charger. The vehicle proceeded to depart north bound on Bellaire. At approximately 12:54 pm, ACUNA and ZAVALA returned to 415 Bellaire Avenue in the black Charger, went inside the residence for several minutes, and came back out and left in the black Charger. At approximately 2:34 pm, ZAVALA, ZAVALA's son, ACUNA and the previous unknown male wearing red shirt/white pants returned to 415 Bellaire Avenue in the black Charger. At approximately 3:32 pm, ACUNA came out of 415 Bellaire Avenue carrying a backpack and reached inside the black Charger for a moment. After going back into 415 Bellaire Avenue and coming back outside, ACUNA was carrying a large black trash bag which he placed in the trunk of his black Camaro and left the residence at 3:54 pm. ACUNA arrived at 2434 Poplar Avenue at approximately 4:00 pm, grabbed the large black trash bag from the trunk of his vehicle, and went inside.

19. On 5/7/2023, fixed surveillance was conducted on 2434 Poplar Avenue. At 3:25 am, a silver 4 door sedan pulled up to the curb just past the residence. The vehicle just sat there until 5:05 am when all four doors suddenly opened, and four unknown individuals jumped out of the car and ran up to the front door of 2434 Poplar Avenue. They immediately went inside. One minute later at 5:06 am, all four came running out of the residence. (There was a female with a white shirt that also ran out with them and got into a white sedan parked out front). The four appeared to run to the black Camaro parked in the driveway for a moment, but then they all started running toward their vehicle and appeared to shoot handguns towards the residence. They got in their vehicle and drove off. The female in a white shirt ran back towards the house and attempted to assist another female who came out of the residence. This female fell to the ground. ACUNA came out of the residence and assisted this female into the white vehicle. The female with a white shirt got in the driver's seat and they drove to the hospital. ACUNA spent the next several minutes going in and out of the house with a flashlight before officers with the KCPD showed up. After completing their investigation, it appears four unknown individuals attempted a home invasion at ACUNA's residence. ACUNA indicated they stole several of his firearms and car keys. When KCPD officers went inside ACUNA's residence, they took photos of the damage and also observed several bags of suspected marijuana and a firearm sitting on the coffee table along with what appeared to be burnt marijuana roaches (common way to smoke marijuana). Police identified the firearm (AR-15 style) as a Bushmaster, model XM15-E2S, multi-caliber, rifle, bearing serial number BK5028895. ACUNA claimed the firearm was his own. Additionally, at 11:28 am

ZAVALA and BONHOMME pulled up to the residence in ZAVALA's black Dodge Charger. There were looking at the damage from the gunfire and went inside the residence for a period of time before both coming back out and leaving in the Dodge Charger at 1:44 pm. SA Hegarty later spoke with the ATF CI who advised the CI had spoken with ACUNA and ACUNA advised he didn't know who robbed him, but they took his firearms and "hard stuff." CI could not say exactly what was taken, but believed ACUNA was talking about cocaine because ACUNA is a part of ZAVALA's drug trafficking network and ZAVALA primarily distributes marijuana and cocaine for ZAVALA.

20. On 5/11/2023, ATF Agents met up with the CI for the purpose of conducting a controlled purchase of narcotics from ZAVALA. The CI confirmed ZAVALA was ready to deal with ATF UC again and sell the UC two Glock machineguns. Prior to the deal, CI was searched for contraband withing nothing found. At approximately 12:45pm, the UC and CI drove to 718 Newton Avenue and parked immediately in front of the residence. ZAVALA then called the CI and informed the CI that ZAVALA was inside the residence and instructed them to come inside. Upon entering, the UC observed BONHOMME laying on a mattress immediately inside the front door. BONHOMME stood up and the UC observed BONHOMME to possess a handgun with a large capacity magazine inside the front of BONHOMME's waistband. ZAVALA then went inside a bedroom and opened a large safe. ZAVALA exited the bedroom carrying several assorted firearms. ZAVALA laid them on the floor in the living room. While doing, so, the UC looked into the aforementioned bedroom and observed two large gun safes; one of which was open. The UC observed a large quantity of assorted firearms inside the open safe. ZAVALA returned to the safe, removed additional firearms and again placed them on the floor of the living room. At this point, the CI received an incoming phone call and stepped outside to talk. The UC approached ZAVALA and informed ZAVALA that the UC wanted to deal directly with ZAVALA and no longer wanted to pay the "tax" for the CI brokering the transaction. ZAVALA agreed and provided the UC with his phone number (417-210-5372). Furthermore, ZAVALA instructed the UC to purchase an inexpensive firearm with the CI present and then to return later without the CI in order to make a larger purchase, to which the UC agreed. The CI then re-entered the residence. ZAVALA had placed several rifles, handguns, and shotguns on the floor and informed the UC that they were all for sale. The UC examined the firearms and asked if any of them were "fully", which is common vernacular for fully automatic, or a machine gun. ZAVALA stated that he had the ability to make all of the AR's fully automatic immediately. The UC asked if the handguns were fully automatic to which ZAVALA replied, "I can make both the Glocks fully too." The UC asked if ZAVALA could make them fully automatic immediately. ZAVALA stated, "Ya, I can but it's as my other, it's at another house, but I can make it happen, it ain't gonna take no time at all." UC knew ZAVALA to be indicating that the "Switches" are located at his other residence and that he would retrieve them and place them on the handguns in order to convert them into fully automatic. Per the previous instruction of ZAVALA, UC agreed to purchase an inexpensive Hi-Point, model 995, 9mm caliber, semi-automatic rifle, bearing serial number A04886 for $240.00, with the plan of returning later without the CI for additional purchases. UC then provided ZAVALA

8

with $240.00 for the aforementioned firearm. The CI and UC exited the residence and returned to the staging location for debriefing. The CI was searched for contraband and ATF Agents did not locate any contraband.

21. ATF surveillance units continued to observe the residence and at 1351 hours, saw BONHOMME come out, get into his maroon Pontiac Grand Prix, and drive away. Surveillance units followed BONHOMME as he drove straight to 415 Bellaire Avenue where BONHOMME parked and went inside 415 Bellaire Avenue. At approximately 1420 hours, the ATF UC received a call from ZAVALA asking where the UC was at. The UC advised the UC was waiting to hear from ZAVALA that the MCDs were ready. ZAVALA said they were ready and instructed the UC to come to 718 Newton again. While monitoring ZAVALA's phone calls, the Pen Register device identified that ZAVALA called BONHOMME immediately after ZAVALA hung up with the UC. Three minutes later, at 1423 hours, BONHOMME came out of 415 Bellaire Avenue, got into the Pontiac Grand Prix, and drove straight to 718 Newton Avenue as surveillance units followed. Several minutes after BONHOMME went into 718 Newton Avenue. ZAVALA spoke with the UC again on the phone and instructed the UC to park in the alley behind 718 Newton Avenue, which the UC did. The UC entered the residence through the rear door and immediately observed the house occupied by BONHOMME, Marco Zavala, and Mary Steinbrook (ZAVALA's mother, aka Mary Mera) and ZAVALA. UC observed three Glock Switches and three handguns on the kitchen counter. ZAVALA entered the bedroom and retrieved an AR-style rifle. UC agreed to purchase three Glock handguns, three Glock Switches, two fully automatic AR-style rifles, and ½ ounce of cocaine for $5760.00. ZAVALA agreed to place one of the Glock Switches on the handgun in order to show the UC how to do it. ZAVALA instructed BONHOMME to convert the two rifles into fully automatic. BONHOMME, still armed with a handgun in his waistband, retrieved the two rifles from the floor and entered the 1st bedroom. Shortly thereafter, BONHOMME exited with the firearms. UC examined them and confirmed them to both be fully automatic. (At this point, Steinbrook and Marco Zavala departed the residence). ZAVALA, attempting to place a Glock Switch on one of the handguns, accidentally broke the Switch. The UC stated the UC preferred to buy fully automatic firearms. ZAVALA then offered to sell an AR machine gun instead of a handgun for the same previous price of $5760.00, to which UC agreed. ZAVALA entered the bedroom and exited with an AR-style pistol. UC stated UC would accept it. ZAVALA instructed BONHOMME to convert the firearm to fully automatic, to which BONHOMME complied. UC examined the firearm and observed it to be fully automatic. ZAVALA went into the bedroom and returned with a H&K, model HK33 machine gun. ZAVALA stated that it was "military issued" and showed UC that it was fully automatic. ZAVALA stated that military-issued machine guns were of better quality than the rifles ZAVALA converts to fully automatic. ZAVALA stated that he paid $4,000.00 for it but would sell it to UC for $4500.00. ZAVALA stated he could provide additional firearms, as well as Glock Switches, to UC. ZAVALA also stated that he, as well as BONHOMME, could make modifications to firearms as well. ZAVALA stated that BONHOMME was his "gunsmith". UC stated UC was interested in

purchasing a large quantity of Glock Switches. ZAVALA stated he could contact his Glock Switch source and place an order for UC. ZAVALA stated he could obtain as many as 50 Glock Switches for UC. ZAVALA instructed BONHOMME to retrieve cocaine for UC. BONHOMME went into the first bedroom and the UC could hear BONHOMME enter the safe. Shortly thereafter, BONHOMME exited with a clear plastic baggie containing suspected cocaine. BONHOMME provided it to ZAVALA and ZAVALA placed the suspected cocaine on a digital scale confirming the weight of 15 grams. The UC count $5760.00 of US Currency and provided it to ZAVALA. ZAVALA retrieved a fabric guitar case and provided it to UC. UC placed the firearms inside the case, exited the rear of the residence, placed the firearms in the trunk of the UC vehicle and departed the area.

22. ATF Agents later identified the purchased firearms as a DPMS, Model A-15, multi caliber, machine gun, bearing serial number N0000786; an Anderson, Model AM-15, multi caliber, machine gun, bearing serial number 22114018; an Anderson, Model AM-15, multi caliber, machine gun, bearing serial number 22055738; two Polymer80, model PF940SC, 9mm caliber pistols with no serial numbers; and two Glock Switches which were confirmed to be Glock Switch MCDs. Also, the narcotics were weighed and tested at the ATF field office and confirmed to weigh 15 grams and tested positive for the presumptive presence of cocaine.

23. On 5/18/2023, at approximately 1:48 pm, ATF UC made telephonic contact with ZAVALA. ZAVALA agreed to sell the UC several AR15 machineguns and instructed UC to meet him at 718 Newton Avenue. The UC went to 718 Newton Avenue and waited for ZAVALA to instruct the UC to go inside. While ATF surveillance were watching 415 Bellaire Avenue, at 2:18 pm ZAVALA came out of 415 Bellaire Avenue and got into his black Pontiac G8. ZAVALA was initially seen carrying a backpack that appeared to have a black object protruding out that is consistent with the appearance of a buffer tube of an AR style firearm. Shortly thereafter, ZAVALA arrived in the Pontiac G8 and parked behind the UC. The UC observed ZAVALA carrying a backpack containing AR15 pistols which were sticking out of the top of the backpack. ZAVALA and the UC went inside 718 Newton Avenue. UC observed two additional unknown males inside the residence. Upon entering, ZAVALA went into the first bedroom. He quickly exited and UC observed him to be holding three AR-style Swift Link MCDs. ZAVALA removed one of the AR-style handgun from the backpack and handed it to UC. UC removed the magazine and observed ammunition within the magazine. UC then worked the action of the firearm and a live round of ammunition ejected out and onto the kitchen floor. ZAVALA then entered the first bedroom and quickly exited with an additional AR-style firearm. ZAVALA provided it to UC for inspection. ZAVALA stated he would sell three of the firearms to UC for $3,000, to which UC agreed. BONHOMME exited the first bedroom. ZAVALA asked him to retrieve an AR15 firearm. BONHOMME returned to the first bedroom. ZAVALA then asked if UC wanted him to place the Swift Links inside the firearms, to which UC responded yes. ZAVALA placed the MCDs in the two AR's. UC asked ZAVALA if he had any more Glock Switches. ZAVALA stated he had a couple, but he could order a larger quantity for UC. UC stated he wanted to purchase

10

approximately 15-20 Switches. ZAVALA stated he would call his source to see how many he had. ZAVALA then made telephonic contact with his source. ZAVALA stated that his source had an additional eight Switches. ZAVALA stated that he believed he had five Switches at ZAVALA's house. ZAVALA agreed to sell 13 Switches to UC for $275.00 each, for a total of $3575.00 to which the UC agreed. UC counted $3000.00 of US Currency and provided it to ZAVALA for the firearms. BONHOMME exited the bedroom with a 7.62cal AR-style handgun and provided it to UC. ZAVALA then took the firearm and placed a MCD inside it in order to convert it to fully automatic. ZAVALA then called his Glock Switch source again in order to confirm that he would be at home in order for ZAVALA to come and acquire the devices. ZAVALA stated to UC, "Let me make sure he's gonna be home. He's young as fuck. He's still in school." ZAVALA informed UC that he would notify UC when he was leaving to pick up the devices and would meet with UC to conduct the transaction later. UC exited the residence and left the area. At approximately 2:42 pm, ZAVALA left 718 Newton Avenue in his Pontiac G8, and surveillance continued to follow ZAVALA.

24. At approximately 4:00 pm, UC received a phone call from ZAVALA. ZAVALA stated he was on his way to pick up the Glock Switches from his source. UC agreed to meet ZAVALA at 718 Newton Avenue again to conduct the transaction. Around this time surveillance last observed ZAVALA driving north on 7th Street from I-35 in Kansas City, Kanas. Surveillance went back to 718 Newton Avenue in anticipation of the next controlled purchase.

25. At approximately 5:00 pm UC received another phone call from ZAVALA. ZAVALA said he was on his way to meet with the UC, but ZAVALA needed to get a couple more Glock Switches from another residence and requested that UC meet him at the Up In Smoke parking lot located at 5908 Wilson Avenue.

26. At approximately 5:43 pm, ZAVALA pulled up to 415 Bellaire where ZAVALA went inside briefly and came back out.

27. At approximately 5:47 pm, ZAVALA drove up to 5908 Wilson Avenue and parked. The UC exited the UC vehicle and entered the passenger seat of ZAVALA's vehicle. UC observed ZAVALA to be holding several silver packages containing Glock Switches. ZAVALA stated that he was able to obtain 14 of them. UC counted $3860.00 and provided it to ZAVALA. ZAVALA counted the currency and confirmed the amount. ZAVALA stated he could obtain additional firearms for UC. UC exited the vehicle, returned to the UC vehicle, and left the area. ZAVALA drove straight to 415 Bellaire Avenue and went inside.

28. The purchased firearms were later identified as an Anderson, Model AM-15, multi-cal machine gun, bearing serial number 22114003; Anderson, Model AM-15, multi-cal machine gun, bearing serial number 22104041; and an Anderson, Model AM-15, 7.62x39mm caliber,

11

machine gun, bearing serial number 22114044. Also purchased were 14 Glock Switches that had been provided to the UC in six separate plastic baggies.

29. It should also be noted that every MCD (Swift Links and Glock Switches) purchased by the UC or CI from ZAVALA and BONHOMME was verified by the ATF Firearms & Ammunition Technology Division (FATD) to be machineguns. Furthermore, ATF FATD provided the following determination in relation to every MCD (including all Glock Switches and Swift Links) purchased by the UC and CI:

- **Exhibit __, is a <u>combination of parts</u> designed and intended for use in converting a weapon into a machinegun, thus a "machinegun" as defined in the NFA, 26 U.S.C. § 5845(b).**
- **Being a "machinegun," Exhibit __ is also a "firearm" per the definition in the NFA, 26 U.S.C. § 5845(a)(6).**
- **Exhibit __, being a "machinegun" per 26 U.S.C. § 5845(b), is a "machinegun" in accordance with the reference in the GCA, 18 U.S.C. § 921(a)(23), which specifically relies on the meaning given this term in the NFA.**
- **The Exhibit bears no legitimate manufacturer's marks of identification or serial number as required by the NFA, 26 U.S.C. § 5842.**

12

30. The aforementioned events occurred within the city of Kansas City, County of Jackson, State of Missouri, which is within the Western District of Missouri. These events give rise to probable cause that these subjects, Alejandro ZAVALA, Cody BONHOMME and Kaleb ACUNA are in violation of various federal laws, including, but not limited to, 18 U.S.C. 933 (Conspiracy to Traffick Firearms), 21 U.S.C. §§ 841(a)(1) and 846, (distribution of controlled substances, possession with the intent to distribute controlled substances, and conspiracy to distribute controlled substances) and 21 U.S.C §§ 856 (a)(1)(maintaining a drug residence).

Further, your Affiant sayeth not.

*John Hegarty*
JOHN HEGARTY
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Subscribed and sworn to me by telephone this  25th  day of May, 2023.

Sworn to by telephone
4:30 PM, May 25, 2023

*Lajuana M. Counts*
HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Western District of Missouri



13